J-S56031-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: A.A.S., A MINOR : | IN THE SUPERIOR COURT OF |
| : | PENNSYLVANIA |
| : | |
| APPEAL OF: A.D.T., MOTHER : | |
| : | No. 993 EDA 2017 |

Appeal from the Decree February 21, 2017,
in the Court of Common Pleas of Philadelphia County,
Family Court Division, at Nos. CP-51-AP-0000849-2016 and
CP-51-DP-0000527-2015

| | |
|---|---|
| IN THE INTEREST OF: A.T., A MINOR : | IN THE SUPERIOR COURT OF |
| : | PENNSYLVANIA |
| : | |
| APPEAL OF: A.D.T., MOTHER : | |
| : | No. 1029 EDA 2017 |

Appeal from the Decree February 21, 2017,
in the Court of Common Pleas of Philadelphia County,
Family Court Division, at Nos. CP-51-AP-0000848-2016 and
CP-51-DP-0000528-2015

BEFORE: BOWES, STABILE, AND PLATT[*], JJ.

MEMORANDUM BY PLATT, J.:                    **FILED NOVEMBER 09, 2017**

In these consolidated appeals,[1] A.D.T., (Mother), appeals from the decrees of the Court of Common Pleas of Philadelphia County entered on February 21, 2017, that involuntarily terminated her parental rights to her Children, A.T. (born in February 2013), and A.A.S. (born in February 2012),

---

[*] Retired Senior Judge assigned to Superior Court.

[1] This Court consolidated these appeals, *sua sponte*, on May 9, 2017.

and changed their goals to adoption.[2]  Mother's counsel has filed a motion to withdraw pursuant to **Anders v. California**, 386 U.S. 738 (1967).  We affirm the trial court's decrees and grant counsel's motion.

The trial court has provided a comprehensive narrative of the facts and procedure of this case in its opinion entered May 10, 2017.  We direct the reader to that opinion for the history of this case.

Philadelphia's Department of Human Services (DHS) filed its petitions to terminate Mother's parental rights to the Children on September 16, 2016.  The trial court held a hearing in this matter on February 21, 2017.  Testifying at that hearing, in addition to Mother, was Community Umbrella Agency caseworker, Laitta Maciglio.

The trial court entered its decrees terminating Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b) and changing their goals to adoption on February 21, 2017.  Mother filed her notice of appeal and statement of errors complained of on appeal to the termination of her rights to A.A.S. on March 20, 2017, and to A.T. on March 23, 2017.  The trial court entered its opinion on May 10, 2017.  **See** Pa.R.A.P. 1925.

On June 19, 2017, Mother's attorney filed a motion to withdraw as counsel and an **Anders** brief in which she raised the following questions:

---

[2]  The trial court involuntarily terminated the parental rights of the Children's father, A.L.S., a/k/a A.S. (Father), on January 17, 2017.  Father did not appeal.

[1.] Whether there is anything in the record that might arguably support the appeal that obviates a conclusion that the appeal is frivolous[?]

[2.] Whether the trial court committed reversible error when it involuntarily terminated [M]other's parental rights where such determination was not supported by clear and convincing evidence under the adoption act, 23 Pa.C.S.A. [§§] 2511(a)(1), (2), (5), (8)[?]

[3.] Whether the trial court committed reversible error when it involuntarily terminated [M]other's parental rights without giving primary consideration to the effect that the termination would have on the developmental, physical and emotional needs of the Child[ren] as required by the adoption act, 23 Pa.C.S.A. [§] 2511(b)[?]

[4.] Whether the trial court erred because the evidence was overwhelming and undisputed that [M]other demonstrated a genuine interest and sincere, persistent and unrelenting effort to maintain a parent-child relationship with [Children][?]

(*Anders* Brief, at 6) (unnecessary capitalization omitted)

Before we begin our analysis, we must dispose of the motion to withdraw filed by Mother's counsel.

When considering an *Anders* brief, this Court may not review the merits of the underlying issues until we address counsel's request to withdraw. In order to comply with *Anders* and its Pennsylvania progeny, counsel must:

(1) petition the court for leave to withdraw stating that after making a conscientious examination of the record and interviewing the defendant, counsel has determined the appeal would be frivolous;

(2) file a brief referring to anything that might arguably support the appeal, but which does not resemble a "no merit" letter or *amicus curiae* brief; and

- 3 -

(3) furnish a copy of the brief to defendant and advise him of his right to retain new counsel, proceed *pro se* or raise any additional points that he deems worthy of the court's attention.

*In re S.M.B.*, 856 A.2d 1235, 1237 (Pa. Super. 2004) (citations omitted) (noting that "the briefing requirements of *Anders* are appropriate and applicable in an appeal from an order terminating parental rights.").

In *Commonwealth v. Santiago*, 978 A.2d 349 (Pa. 2009), our Supreme Court addressed the contents of an *Anders* brief, and required that

. . . in the *Anders* brief that accompanies court-appointed counsel's petition to withdraw, counsel must: (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Santiago*, *supra* at 361. "After an appellate court receives an *Anders* brief and is satisfied that counsel has complied with the aforementioned requirements, the Court then must undertake an independent examination of the record to determine whether the appeal is wholly frivolous." *In re S.M.B.*, *supra* at 1237 (citation omitted).

With respect to the third requirement of *Anders*, that counsel inform the defendant of his or her rights in light of counsel's withdrawal, this Court has held that counsel must "attach to their petition to withdraw a copy of the

letter sent to their client advising him or her of their rights." ***Commonwealth v. Millisock***, 873 A.2d 748, 752 (Pa. Super. 2005).

Mother's attorney, in his application to withdraw as counsel, has stated that he has made a conscientious review of the record, concluded that his client's appeal is wholly frivolous, and stated the reasons for his conclusion. In addition, he timely mailed his client: (1) a copy of his petition to withdraw; (2) a copy of the ***Anders*** brief; and (3) a letter advising his client of her rights to retain new counsel, proceed *pro se* or raise any additional points that she deems worthy of the Court's attention. Counsel has filed the required ***Anders*** brief in this Court setting forth the issues he believes might arguably support his client's appeal. Thus, we are satisfied that counsel for Mother has complied with the procedural requirements of ***Anders***. Additionally, after an independent examination of the record, we conclude that the appeal is wholly frivolous. ***See In re S.M.B.***, ***supra*** at 1237. Thus, we grant his leave to withdraw as counsel.

Our standard of review is as follows:

In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Further, we have stated:

Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result.

We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the trial court's sustainable findings.

*In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citations omitted).

The trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b). In order to affirm the termination of parental rights, this Court need only agree with any one subsection of Section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Requests to have a natural parent's parental rights terminated are governed by 23 Pa.C.S.A. § 2511, which provides, in pertinent part:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

* * *

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

* * *

23 Pa.C.S.A. §§ 2511(a)(1), (b).

It is well settled that a party seeking termination of a parent's rights bears the burden of proving the grounds to so do by "clear and convincing evidence," a standard which requires evidence that is "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re T.F.*, 847 A.2d 738, 742 (Pa. Super. 2004) (citations and internal quotation marks omitted).  Further,

A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship.  Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In the Interest of K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008) (citations omitted).

To terminate parental rights pursuant to section 2511(a)(1), the person or agency seeking termination must demonstrate through clear and convincing evidence that, for a period of at least six months prior to the filing of the petition, the parent's conduct demonstrates a settled purpose to relinquish parental rights or that the parent has refused or failed to perform parental duties. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003).

With respect to subsection 2511(a)(1), our Supreme Court has held:

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 92 (Pa. 1998) (citation omitted). Further,

> the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005) (citations omitted).

The Adoption Act provides that a trial court "shall give primary consideration to the developmental, physical and emotional needs and welfare

of the child." 23 Pa.C.S.A. § 2511(b). The Act does not make specific reference to an evaluation of the bond between parent and child but our case law requires the evaluation of any such bond. ***See In re E.M.***, 620 A.2d 481, 485 (Pa. 1993). However, this Court has held that the trial court is not required by statute or precedent to order a formal bonding evaluation performed by an expert. ***See In re K.K.R.-S***., 958 A.2d 529, 533 (Pa. Super. 2008).

We have read the trial court opinion entered in this matter on May 10, 2017, and find it to be a correct and thorough analysis of the issues presented. (***See*** Trial Court Opinion, 5/10/17, at 8-10, 16-17) (holding that Mother failed to perform her parental duties for nineteen months when Children have been in care and has evidenced a settled purpose of relinquishing parental claims to Children, and Mother's bond with Children is attenuated, adoption is in best interest of Children, and neither Child would suffer irreparable harm if Mother's parental rights were terminated).

Accordingly, we affirm the decrees of the Court of Common Pleas of Philadelphia County, entered February 21, 2017, that involuntarily terminated Mother's parental rights and changed the Children's goals to adoption on the basis of the trial court opinion.[3]

---

[3] Mother has waived any challenge to the change of permanency goal to adoption by her failure to raise the issue in her concise statement and in the statement of questions involved portion of her brief. ***See Krebs v. United Refining Company of Pennsylvania***, 893 A.2d 776, 797 (Pa. Super. 2006).

Decrees affirmed.  Motion to withdraw as counsel granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/9/2017

IN THE COURT OF COMMON PLEAS
FOR THE COUNTY OF PHILADELPHIA
FAMILY COURT DIVISION

| | | |
|---|---|---|
| In the Interest of A. S., a minor | : | CP-51-DP-0000527-2015 |
| | : | CP-51-AP-0000849-2016 |
| | : | |
| In the Interest of A. T., a minor | : | CP-51-DP-0000528-2015 |
| | : | CP-51-AP-0000848-2016 |
| | : | |
| | : | 51-FN-000448-2015 |
| | : | |
| APPEAL of: A.T., Mother | : | 993/1029 EDA 2017 |

OPINION[1]

Fernandes, J.:

Appellant A.T. ("Mother") appeals from the order entered on February 21, 2017, granting the petition filed by the Philadelphia Department of Human Services ("DHS"), to involuntarily terminate Mother's parental rights to A. S. ("Child 1") and A. T. ("Child 2) (collectively "Children") pursuant to the Adoption Act, 23 Pa. C. S. A. §2511(a)(1), (2), (5), (8), and (b). Edelina Schuman, Esq., counsel for Mother[2], filed a timely Notice of Appeal with a Statement of Matter Complained of on Appeal pursuant to Rule 1925(b).

**Factual and Procedural Background:**

The family in this case became known to DHS on January 25, 2015, when DHS received a General Protective Services ("GPS") report alleging that Mother was unable to care for the Children; that Mother was residing in a rooming house and was unable to reside in a home with the Children; that Mother had no income or any other means of financial support; and that Mother had no medical coverage and no support from the Children's father ("Father"), who was incarcerated in Georgia. The report further alleged that Mother was unable to cope with the responsibilities of parenting at the time. Mother was unable to demonstrate

---

[1] The trial court requested the Notes of Testimony on February 27, 2017. A subsequent request was made on March 24, 2017. The trial court received Notes of Testimony on April 20, 2017

[2] Counsel for Mother, Edelina Schuman, was vacated by a motion granted on April 4, 2017, and an appeal counsel was appointed that same day. The new appeals counsel is Gary Server, Esquire.

appropriate protective capacities for the Children. Mother was willing to have the Children placed with a relative until she was able to gain housing and employment. The Children reportedly resided with the paternal grandmother ("PGM"), and PGM wanted to receive kinship care services for the Children. The report was found to be valid.

On January 30, 2015, DHS visited Mother's home and learned that the home belonged to the children's maternal great aunt. Mother was not home, so DHS left a letter to Mother regarding the GPS allegations. DHS spoke to Mother over the telephone, and she informed DHS that she was en route to Virginia to seek employment. DHS offered to assist Mother with getting into a shelter, but Mother refused the assistance. DHS informed Mother that she had to return to Philadelphia to sign releases for the Children so that PGM could ensure that their needs were met; Mother refused to return until the following week. That same day, DHS visited PGM's home. DHS learned that Mother was transient and had been moving between New Jersey, Philadelphia, and Virginia; that the Children had been residing with PGM since September 2014; and that Mother had a history of leaving the Children with different caregivers and not returning. The most recent incident occurred in August 2014, when Mother left the Children with a babysitter in Georgia and returned to Philadelphia without them. The babysitter had contacted PGM and informed her that Mother had not returned for the Children and that Georgia's Office for Children and Families would be called if the Children could not be picked up. PGM informed DHS that she went to Georgia and picked up the Children. (N.T. 2/21/17, pgs. 11-12). PGM also reported that Mother's contact with the Children was sporadic. DHS learned that Child 2 had hearing loss due to unknown trauma and that Child 1 needed speech therapy. DHS completed a home assessment and clearances for PGM. DHS implemented a Safety Plan for PGM to ensure the Children's needs were being met. DHS made several unsuccessful attempts to reach Mother in regards to the GPS report. On February 24, 2015, DHS spoke with Mother via telephone and offered to assist her, again, with getting into a shelter so that she could care for the Children; Mother refused and stated that she wanted PGM to care for the Children. Mother refused to cooperate with providing DHS releases to assist PGM with caring for the Children. DHS made several appointments to speak with Mother about the Children's welfare, but she cancelled all of them.

On March 3, 2015, DHS obtained an Order for Protective Custody ("OPC") for the Children. At a shelter care hearing on March 6, 2015, the OPC was lifted and the temporary commitment to DHS was ordered to stand. The court granted both parents supervised visits at the agency if they availed themselves. On March 20, 2015, the Children were adjudicated dependent and fully committed to DHS. The court granted both parents supervised visits at the agency as arranged and ordered both parents to comply with all services and recommendations. At a permanency review hearing on June 17, 2015, the Community Umbrella Agency ("CUA") case manager testified that Mother did not have appropriate housing and was still transient. Mother did not request visits with the Children until May 2015, and made three out of five visits. Mother was referred to the Achieving Reunification Center ("ARC") for parenting, but indicated to CUA that she had no intention of participating. The court ordered that Mother continue to be offered weekly supervised visits at the agency. At another permanency review on September 16, 2015, the court found Mother to be minimally compliant based on testimony that Mother did not keep in frequent contact with CUA; that she had not participated in parenting or mental health services through ARC; that she was unemployed; and that she was not making her supervised visits. Mother had not visited the Children since June 15, 2015, and PGM reported that Mother did not call the Children. The court granted Mother weekly supervised visits and ordered Mother to confirm visits twenty-four hours in advance. The court also ordered Mother to follow through with the ARC referral and to be referred to Behavioral Health Services ("BHS") for consultation and evaluation. On November 9, 2015, Mother was evaluated at BHS; the evaluation recommended individual outpatient therapy, a life skills coach, parenting classes, domestic violence, and to continue compliance with all DHS requests and recommendations. At a June 7, 2016, permanency review, the court found Mother to be minimally compliant with her Single Case Plan ("SCP") objectives. CUA testified that Mother was scheduled for mental health services through COMHAR; that she had been attending ARC for parenting since March 2016; that she was residing with the Children's maternal grandmother ("MGM"), which was not appropriate, and that Mother declined housing services through ARC; that Mother was employed at a nail salon, but failed to provide requested documentation; and that Mother had attended nine of her twelve offered supervised visits. The court granted Mother weekly supervised visits at the agency and referred Mother back to ARC for

parenting and housing. The court ordered Mother to comply with her COMHAR appointment, and ordered her to be referred for domestic violence.

DHS filed petitions for termination of Mother's parental rights and change of the permanency goal from reunification to adoption on September 16, 2016. The termination petitions were heard on February 21, 2017. At the time of the termination trial, the Children had been in care for nineteen months. (N.T. 2/21/17, pg. 6).

The CUA case manager testified that Mother was minimally compliant with her SCP objectives. (N.T. 2/21/17, pg. 27). CUA testified that Mother's objectives, at the time of the termination hearing, were to stabilize mental health; to improve parenting skills and knowledge via parenting classes; to obtain suitable housing; to visit with the Children and confirm visits at least twenty-four hours in advance; to address any past domestic violence; and to obtain photo identification and medical insurance. Mother was aware of her objectives. (N.T. 2/21/17, pgs. 12-13). Mother completed parenting classes through the Parent Action Network ("PAN") in July 2016. (N.T. 2/21/17, pg. 14, 31, 42). Mother completed a BHS assessment, after which BHS recommended that Mother enroll in individual outpatient therapy. Mother missed her scheduled intake to COMHAR for outpatient therapy in February 2016, but Mother rescheduled and completed the intake in March 2016. Mother's attendance for therapy at COMHAR was inconsistent. Mother admitted that her evaluation recommended therapy for her, but testified that the therapy was just to deal with emotional trauma. (N.T. 2/21/17, pgs. 40-42).

Mother did not have adequate housing at any point during the life of the case. Mother was homeless and transient, living in different New Jersey motels or staying with friends or with MGM. CUA testified that Mother moved into her paternal aunt's house, the Children's great aunt, about three months prior to the termination trial. Mother completed housing and financial workshops at ARC and was provided with brochures for different housing and shelters, including the Philadelphia Housing Authority. Mother refused to participate in any of the shelter programs. CUA testified that Mother moves frequently, so she could not confirm if the great aunt's home was permanent housing for Mother. (N.T. 2/21/17, pgs. 17-18, 29-33, 36-38, 42). Mother testified that she intended to stay with a great aunt until she

found her own place. Mother also testified that she is waiting until her therapy at Congresso is complete, so that they can help her pay her rent deposit. Mother testified that she did not feel safe at the shelters, but did apply for housing at PHA in September 2016. (N.T. 2/21/17, pgs. 43-45).

Mother is not currently employed. Throughout the life of the case, Mother has held different jobs, which CUA was able to verify. Mother is unable to hold a steady job. Mother most recently reported that she was employed at a nail salon. Shortly before the termination trial, the nail salon informed CUA that Mother only worked there during the holiday and was no longer employed with them. Mother did not submit any documentation showing her employment during the life of the case. Mother did not attend job training or any employment class at ARC. (N.T. 2/21/17, pgs. 18-19; 30-31).

Mother was referred to a domestic violence course through Congresso. CUA testified that a letter from Congresso confirmed that Mother enrolled in the program in July 2016; however, Mother did not sign the releases for CUA to obtain any further information. Mother was aware that she had to sign the releases for CUA to verify her enrollment and attendance. Mother did not provide CUA with a certificate of completion from a domestic violence program. (N.T. 2/21/17, pgs. 19-20, 32). Mother testified that she is still attending domestic violence. Mother claimed that her therapist at Congresso has difficulty squeezing Mother's appointment in and often goes on lengthy vacations. (N.T. 2/21/17, pgs. 42-43).

Mother was ordered to go to the CEU for forthwith drug screens after the last court date, but Mother refused to go. CUA testified that she called Mother for random screens on January 31, 2017; February 7, 2017; and February 15, 2017. Mother tested negative on the January 31st screen, but tested positive for marijuana on February 7th and 15th of 2017, days before the termination trial. Mother's creatinine level on the January 31st screen was seven, fully diluted. Diluted creatinine is anything less than twenty milligrams per DL. The Court noted that the CEU reported that Mother completed her dual diagnosis assessment on February 15, 2017, and the CEU recommended her for intensive outpatient therapy. The CEU, however, needed to complete Mother's final recommendations. The Court also noted from the report that Mother did not provide any information to the CEU and that Mother will need to comply

with all CEU recommendations to improve her chances for treatment success. (N.T. 2/21/17, pgs. 20-23).

Mother had supervised visits with the Children once each week for two hours. Mother never progressed to unsupervised visits. Mother was inconsistent in her visits with the Children. Mother claimed that her limited time with the Children causes her to feel depressed, which impedes later visits. When Mother does attend visits, CUA testified that they go well. However, when Mother does not show, the Children get upset and start crying and PGM usually has to calm them down. CUA testified that Mother never contacted her to ask about the Children or their medical appointments. Mother did not provide the Children with gifts for Christmas, but did provide birthday presents. (N.T. 2/21/17, pgs. 23-25, 36). Mother admitted that she was not compliant with visitation. Mother understood that the Children looked forward to seeing her, but she claimed it was too hard to see them for such a short time. Mother also admitted that she did not see the Children for a significant period of time. Mother testified that she would call every few weeks to speak to the Children; she claimed that calling more frequently was too hard for her. (N.T. 2/21/17, pgs. 45-49).

The Children are currently placed in kinship care with PGM, with whom they have been in care for the entire nineteen months. (N.T. 2/21/17, pgs. 12, 29). The Children are in a safe, permanent and pre-adoptive home. (N.T. 2/21/17, pg. 12). The Children look to PGM to take them to daycare and the Children have an excellent relationship with PGM. PGM also schedules their medical appointments and makes sure they attend. (N.T. 2/21/17, pg. 28). PGM comforts the Children when they are upset. PGM provides for and ensures that all the Children's needs are met. (N.T. 2/21/17, pg. 29).

At the time of the termination trial, Mother had not successfully completed her SCP objectives. Mother is unable to take immediate custody of the Children. Mother had completed her parenting classes, housing workshop, and the financial workshop at ARC. Mother's attendance for outpatient therapy was inconsistent. Mother never had adequate housing and moves from place to place. Mother is transient. Mother refused to stay in any shelters and only applied for PHA housing in September 2016. Mother is presently living with a great aunt, but admitted that she is only staying there until she can find her own place.

Mother is not employed. Mother is unable to hold a steady job and has had numerous different positions during the life of the case. Mother did not complete domestic violence nor did she sign releases for CUA to obtain any of the information. Mother tested positive for marijuana shortly before the termination trial. Her negative screen in January 2017 had a fully diluted creatinine level. The CEU recommended intensive outpatient therapy for Mother after her dual diagnosis assessment. Mother's visits with the Children were inconsistent. The court found clear and convincing evidence that changing the permanency goal to adoption and involuntarily terminating Mother's parental rights were in the Children's best interests. The court also found that the Children would not suffer irreparable harm if Mother's parental rights were terminated. Following argument, the trial court terminated Mother's parental rights to the Children under 23 Pa. C. S. A. §2511(a)(1), (2), (5), (8), and (b), and changed the goal to adoption. On March 23, 2017, Mother's attorney filed this appeal on behalf of Mother.

**Discussion:**

Mother raises the following errors on appeal:

1. Whether the trial court committed reversible error, when it involuntarily terminated mother's parental rights where such determination was not supported by clear and convincing evidence under the adoption act, 23 PA.C.S.A. §2511(a)(1), (2), (5), and (8).

2. Whether the trial court committed reversible error when it involuntarily terminated mother's parental rights without giving primary consideration to the effect that the termination would have on the developmental, physical and emotional needs of the [Children] as required by the adoption act, 23 PA.C.S.A. §2511(b).

3. Whether the trial court erred because the evidence was overwhelming and undisputed that mother demonstrated a genuine interest and sincere, persistent, and unrelenting effort to maintain a parent-child relationship with her [Children].

Mother did not appeal the change of permanency goal to adoption, so she has waived that issue on appeal.[3] *See Krebs v. United Refining Co.*, 893 A.2d 776, 797 (Pa. Super. 2006). *See also In re K.T.E.L.*, 983 A.2d 745 (Pa. Super. 2009).

Mother has appealed the involuntary termination of her parental rights. The grounds for involuntary termination of parental rights are enumerated in the Adoption Act at 23 Pa. C. S. A. §2511(a), which provides the following grounds for §2511(a)(1):

> (a) **General rule** – The rights of a parent, in regard to a child, may be terminated after a petition is filed on any of the following grounds:
>
> (1) The parent, by conduct continuing for a period of at least six months immediately preceding the filing of the petition, has either evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

In proceedings to involuntary terminate parental rights, the burden of proof is on the party seeking termination which must establish the existence of grounds for termination by clear and convincing evidence. *In re Adoption of Atencio*, 650 A.2d 1064 (Pa. 1994). To satisfy section (a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. However, the six-month period should not be applied mechanically; instead, the court must consider the whole history of the case. *In re B.N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004). The standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction without hesitance of the truth of precise facts in issue. *In re C.R.S.*, 696 A.2d 840, 843 (Pa. Super. 1997).

The petitions for involuntary termination of parental rights and goal change were filed on September 16, 2016. For the six month period prior to filing, Mother did not successfully

---

[3] Mother did not appeal the change of permanency goal to adoption in her Statement of Errors Complained of on Appeal Pursuant to Pa.R.A.P. Rule 1925(b). For this reason, this opinion will only address the issues appealed.

complete her SCP objectives. Mother did complete her parenting classes through PAN and her financial training at ARC. (N.T. 2/21/17, pgs. 14, 31, 42). Mother completed her BHS assessment and enrolled in outpatient therapy at COMHAR. Mother's attendance was inconsistent. Mother admitted that she often missed appointments due to oversleeping, giving different excuses each time, and only attends one or two appointments each month. (N.T. 2/21/17, pgs. 14-16). Mother admitted that she was recommended for outpatient therapy, but claimed it was specifically for emotional trauma. Mother did not have adequate housing throughout the life of the case. Mother is transient. Mother is presently staying with a great aunt until she can find a place of her own, though refuses to stay in a shelter. CUA has provided Mother with guidance to seek her own housing. Mother only applied for PHA housing in September of 2016. Mother is waiting to complete her therapy at Congresso to seek assistance to pay rent. (N.T. 2/21/17, pgs. 17-18, 29-33, 36-38, 42-45). Mother is currently unemployed. Mother is unable to hold a steady job. Mother held multiple jobs during the life of the case and never submitted any paperwork showing her employment. Mother's most recent employment was at a nail salon during the holidays. Mother did not attend any job training or employment class at ARC. (N.T. 2/21/17, pgs. 18-19, 30-31). Mother did not successfully complete her domestic violence objective. Mother admitted that she still attends domestic violence courses at Congresso. Mother claimed that her therapist's lengthy vacations prevented Mother from completing the course sooner. Mother did not sign releases for Congresso, so CUA was unable to obtain any information about Mother's attendance or enrollment. (N.T. 2/21/17, pgs. 19-20, 32, 42-43). Mother refused to attend a forthwith screen after the last court date. Mother did, however, show for three random screens in January and February of 2017. Mother tested negative in January, but had a fully diluted creatinine level, meaning that she is washing her urine to hide any substance in her system. Mother tested positive for marijuana on both February screens; one less than a week before the termination trial. The CEU reported that Mother was recommended for intensive outpatient therapy. (N.T. 2/21/17, pgs. 20-23). Mother had weekly supervised visits with the Children and never progressed to unsupervised visits. Mother was inconsistent in her attendance of the visits. In June 2016, Mother attended two out of four visits; no visits in August 2016; one visit in both September and October 2016; two visits in November and December of 2016 and January 2017; and one out of one visit in February 2017. Mother

attended eleven visits with the Children out of twenty-six, less than fifty percent. Mother admitted that she did not comply with her visitation objective, claiming that visits with the Children and frequent calls with the Children were too hard for her. (N.T. 2/21/17, pgs. 23-25, 36, 45-49). Over the six months prior to the filing of the termination petitions, Mother failed to perform her parental duties by her consistent failure to successfully complete all of her SCP objectives. Mother's inability to perform those parental duties is not limited to the six month period, but extends throughout the life of the case. The Children have been in care for nineteen months. Mother has an affirmative duty to place herself in a parenting position. Mother evidenced a settled purpose of relinquishing parental claims to the Children by failing and refusing to perform her parental duties. Since these facts were demonstrated by clear and convincing evidence, the trial court did not err or abuse its discretion in terminating Mother's parental rights under this section.

The trial court terminated Mother's parental rights under 23 Pa. C. S. A. §2511(a)(2). This section of the Adoption Act includes, as a ground for involuntary termination of parental rights, the repeated and continued incapacity, abuse, neglect, or refusal of the parent that causes the child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being; and the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent. This ground is not limited to affirmative misconduct. It may include acts of refusal to perform parental duties, but focuses more specifically on the needs of the child. *Adoption of C.A.W.*, 683 A.2d 911, 914 (Pa. Super. 1996).

The Children were taken into DHS custody because Mother was unable to provide essential parental care: Mother had unstable and inappropriate housing; Mother did not have income or financial support; Mother did not have medical insurance; Mother left the Children in Georgia with strangers and returned to Pennsylvania; and Mother was unable to demonstrate appropriate protective capacities for the Children. Mother was unable to remedy the causes of her repeated and continued incapacity to provide the Children with essential parental care, control, or subsistence necessary for the Children's physical and mental well-being. Mother did not successfully complete all of her SCP objectives. Mother was aware of her SCP objectives. (N.T. 2/21/17, pgs. 12-13). Mother completed her

parenting classes through PAN in July 2016. Mother completed an assessment at BHS and was recommended for outpatient therapy. Mother testified that she still attends therapy, meaning she did not complete her objective for mental health. Mother's attendance was inconsistent and she often missed appointments due to oversleeping and other excuses, and testified that she only attended short, thirty minute appointments once or twice each month. (N.T. 2/21/17, pgs. 14-16, 31, 40-42). Mother does not have adequate housing. Mother is transient, moving from place to place throughout the life of the case. Recently, Mother has been staying with a great aunt, but Mother testified that she will only stay there until she finds a place of her own. Mother was referred to different housing and shelters, but Mother refused to stay at any of the shelters. Mother did not apply for PHA housing until September 2016. Mother completed a housing workshop and financial training at ARC. Mother is waiting until her therapy is complete to seek rent and housing assistance. (N.T. 2/21/17, pgs. 17-18, 29-33, 36-38, 42-45). Mother is not employed. Mother has difficulty holding stable employment. Mother held many positions throughout the case, but did not submit any documentation verifying her employment. Mother's most recent reported employment was at a nail salon over the holidays. Mother did not attend job training or an employment class at ARC. (N.T. 2/21/17, pgs. 18-19, 30-31). Mother was referred to Congresso for domestic violence. Mother enrolled in July 2016, but did not sign releases for CUA. Mother testified that she is still attending the domestic violence program. Mother claims she did not complete her domestic violence objective because her therapist often takes lengthy vacations. (N.T. 2/21/17, pgs. 19-20, 32, 42-43). Mother refused to attend her court-ordered forthwith drug screen after the last court date. Mother did attend three random screens in January and February of 2017. In January, Mother tested negative with a fully diluted creatinine level of seven, meaning that she is washing her urine of any substances. Mother tested positive for marijuana on both February screens. The CEU reported that Mother was recommended for intensive outpatient therapy after her dual diagnosis assessment, but has not provided any verification of enrollment in a drug and alcohol program. (N.T. 2/21/17, pgs. 20-23). Mother was inconsistent in her attendance of weekly supervised visits with the Children and never progressed to unsupervised visits. Mother attended less that fifty percent of her visits with the Children and admitted that she did not see the Children for a significant period of time. Mother testified that she called the Children every couple of weeks

during that time. Mother testified that frequent visits and phone calls were too hard for her. During visits that Mother did attend, CUA testified that they go well. When Mother misses visits, the Children get upset and cry. (N.T. 2/21/17, pgs. 23-25, 36, 45-49). Mother has failed to take affirmative steps to place herself in a position to parent the Children. The Children need permanency, which Mother cannot provide. Mother is unable to take immediate custody of the Children and ensure that they receive their therapy and special services. Therefore, DHS met its burden under §2511(a)(2) of the Adoption Act and termination under this section was also proper.

Mother also appeals the trial court's termination of parental rights under 23 Pa. C. S. A. §2511(a)(5), which permits termination when a child was removed, by court or voluntary agreement, and placed with an agency if, for at least six months, the conditions which led to the placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services reasonably available to the parent are not likely to remedy the conditions leading to placement, and termination best serves the child's needs and welfare. DHS, as a child and youth agency, cannot be required to extend services beyond a period of time deemed reasonable by the legislature or be subjected to herculean efforts. A child's life cannot be put on hold in hope that the parent will summon the ability to handle the responsibilities of parenting. *In re J.T.*, 817 A.2d 509 (Pa. Super. 2001). As a consequence, Pennsylvania's Superior Court has recognized that a child's needs and welfare require agencies to work toward termination of parental rights when a child has been placed in foster care beyond reasonable temporal limits and after reasonable efforts have been made by the agency, which have been ineffective. This process should be completed within eighteen months. *In re N.W.*, 851 A.2d 508 (Pa. Super. 2004).

The Children in this case have been in DHS custody since March 2015, nineteen months. The Children were placed in care because Mother was unable to parent. Mother's chief obstacles to reunification was her failure to successfully complete all of her SCP objectives, her inability to obtain stable housing, and her failure to consistently visit with the Children. Mother was aware of her objectives. (N.T. 2/21/17, pgs. 12-13). Mother did complete her parenting classes through PAN. BHS recommended Mother for outpatient therapy after her assessment. Mother enrolled at COMHAR for outpatient therapy, but was inconsistent with

her attendance at appointments and gave different excuses every time. Mother testified that she attends thirty minutes' appointments with the therapist once or twice each month, simply because she oversleeps and misses other appointments. Mother testified that she does not need intense therapy, just someone to talk to concerning her emotional trauma. (N.T. 2/21/17, pgs. 14-16, 31, 40-42). Mother does not have adequate housing and never achieved it during the life of the case. Mother is transient. Mother was referred for housing and shelters, but Mother declined those services and refused to stay at any shelter. Mother did not apply for PHA housing until September 2016. Mother is awaiting completion of her therapy before seeking assistance to pay rent. Mother presently resides with a great aunt, but Mother admitted that she plans to only stay there until she finds a place of her own. (N.T. 2/21/17, pgs. 17-18, 29-33, 36-38, 42-45). Mother is unemployed and cannot hold a steady job. Mother held multiple jobs during the life of the case, though never submitted documentation verifying her employment. CUA did her own investigation as to Mother's various jobs, even learning that Mother's most recent position with a nail salon ended with the Christmas holidays. Mother did not attend any job training or employment classes at ARC. (N.T. 2/21/17, pgs. 18-19, 30-31). Mother did not complete her domestic violence objective and admitted that she is still attending the program at Congresso. Mother did not sign releases for CUA to obtain information from Congresso. Mother claimed that she was unable to finish the domestic violence program earlier due to her therapist taking month-long vacations. (N.T. 2/21/17, pgs. 19-20, 32, 42-43). Mother refused to attend her court-ordered drug screen at the last court date. Mother attended three random drug screens in January and February of 2017. At the end of January, Mother tested negative, but had a fully diluted creatinine level. Mother is washing her urine of any substances. Mother tested positive for marijuana on both February screens, the last taken less than a week before the termination trial. The CEU also reported that Mother was recommended to intensive outpatient therapy after her dual diagnosis assessment. (N.T. 2/21/17, pgs. 20-23). Mother's weekly supervised visits with the Children were inconsistent; Mother attended eleven out of twenty-six scheduled visits. Mother admitted that she did not see the Children for a significant period of time. During that time, Mother testified that she called the Children every couple weeks. Mother claimed that the limited time with the Children were too hard for her. When Mother did attend visits, CUA testified that they went well. (N.T. 2/21/17,

pgs. 23-25, 36, 45-49). PGM has been taking care of the Children's needs since they came into care. (N.T. 2/21/17, pgs. 12, 29). The trial court always found that DHS made reasonable efforts to reunify the Children with Mother. The trial court also found that Mother was unable to remedy the conditions which led to the Children's placement within a reasonable amount of time as evidenced by Mother's failure to successfully complete her SCP objectives. The Children are currently placed in a safe, permanent, and pre-adoptive home. (N.T. 2/21/17, pg. 12). The court heard testimony that adoption is in the Children's best interests and none of them would suffer any irreparable harm if Mother's parental rights were terminated. (N.T. 2/21/17, pgs. 25, 27). Mother was given ample time to place himself in a position to parent the Children. The Children cannot wait for Mother to decide when to parent. The conditions which led to the placement of the Children continue to exist, and Mother cannot and will not remedy them within a reasonable amount of time. As a result, the trial court found that termination of Mother's parental rights would be in the best interests of the Children's physical, intellectual, moral, and emotional well-being. The trial court made this determination on the basis of clear and convincing evidence, so termination under this section was proper.

The trial court also terminated Mother's parental rights under 23 Pa. C. S. A. §2511(a)(8), which permits termination when:

> The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

This section does not require the court to evaluate a parent's willingness or ability to remedy the conditions which initially caused placement or the availability or efficacy of DHS services offered to the parent, only the present state of the conditions. *In re: Adoption of K.J.*, 938 A.2d 1128, 1133 (Pa. Super. 2009). The party seeking termination must also prove by clear and convincing evidence that the termination is in the best interest of the child. The best interest of the child is determined after consideration of the needs and welfare of the child such as

love and comfort, security and stability. _In re Bowman_, A.2d 217 (Pa. Super. 1994). See also _In re Adoption of T.T.B._, 835 A.2d 387, 397 (Pa. Super. 2003).

The Children have been in DHS custody since March 2015, nineteen months, because Mother was unable to parent. Mother has not successfully completed her SCP objectives and has not placed herself in a position to parent the Children. Mother's outstanding objectives were to stabilize mental health; to improve parenting skills and knowledge via parenting classes; to obtain suitable housing; to visit with the Children and confirm visits at least twenty-four hours in advance; to address any past domestic violence; and to obtain photo identification and medical insurance. Mother was aware of her objectives. (N.T. 2/21/17, pgs. 12-13). Mother completed her parenting classes through PAN. BHS recommended that Mother enroll in individual outpatient therapy after her assessment; Mother enrolled at COMHAR and completed her intake in March 2016. Mother was inconsistent in her attendance of her therapy appointments and gave different excuses each time. Mother testified that she overslept and missed appointments, so she only attended one or two appointments each month. Mother claims that she only has thirty minute appointments because she only needed therapy for emotional trauma. (N.T. 2/21/17, pgs. 14-16, 31, 40-42). Mother does not have adequate housing and refuses to stay in any shelters. Mother is transient and has a history of moving from place to place and state to state. CUA testified that Mother was provided with vouchers and brochures to assist, but Mother refused to use them. Mother testified that she has been staying with a great aunt, but only intends to stay there until she can find a place of her own. (N.T. 2/21/17, pgs. 17-18, 29-33, 36-38, 42-45). Mother is currently unemployed. Throughout the life of the case, Mother held different jobs. Mother did not submit any documentation verifying her employment at any time; CUA did her own investigation to verify Mother's employment, even learning that Mother's most recent reported position at a nail salon was only for the past holiday season. Mother did not complete any job training or employment classes at ARC. (N.T. 2/21/17, pgs. 18-19, 30-31). Mother admitted that she is still attending domestic violence, meaning she did not complete her objective. Mother did not sign any releases for CUA and claimed that she did not complete the domestic violence program earlier because her therapist took frequent month-long vacations. (N.T. 2/21/17, pgs. 19-20, 32, 42-43). Mother refused to follow the court

order at the last hearing for a forthwith drug screen. Mother attended three random screens in January and February of 2017. Mother tested negative in January, but had a fully diluted creatinine level. On both February screens, Mother tested positive for marijuana. The second drug screen was less than a week before the termination trial. The CEU reported that Mother was recommended to intensive outpatient therapy after her dual diagnosis assessment. (N.T. 2/21/17, pgs. 20-23). Mother was inconsistent in her weekly supervised visits with the Children. Mother never progressed to unsupervised visits. Between June 2016 and February 2017, Mother attended eleven out of twenty-six visits with the Children. Mother claimed that the limited time with the Children was too hard for her. Mother admitted that she did not see the Children for a significant period of time. During that time, Mother testified that she called the Children every couple of weeks; she claimed that more frequent calls were also too hard for her. Termination of Mother's parental rights were in the Children's best interests. (N.T. 2/21/17, pgs. 25, 27). The Children have been in care for nineteen months and need permanency. The Children are currently placed with PGM, who has cared for them since they entered care. Child 1 receives services, which PGM ensures she attends. PGM provides for all the Children's needs. (N.T. 2/21/17, pgs. 12, 25-29). The conditions that led to the Children's placement into care continue to exist as Mother failed to successfully complete her SCP objectives. The testimony of the DHS witness was credible. Mother was not ready or able, as of the date of the termination trial, to parent Children, take custody, and ensure their needs. As the record contains clear and convincing evidence that termination was in the best interests of the Children, the trial court did not abuse its discretion and termination under this section was also proper.

After a finding of any grounds for termination under section (a), the court must, under 23 Pa. C. S. A. §2511(b), also consider what – if any – bond exists between parent and child. _In re Involuntary Termination of C.W.S.M. and K.A.L.M.,_ 839 A.2d 410, 415 (Pa. Super. 2003). The trial court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." _In re Adoption of T.B.B.,_ 835 A.2d 387, 397 (Pa. Super. 2003). In assessing the parental bond, the trial court is permitted to rely upon the observations and evaluations of social workers. _In re K.Z.S.,_ 946 A.2d 753, 762-763 (Pa. Super. 2008). In cases where there is no evidence of any bond between the parent

and child, it is reasonable to infer that no bond exists. The extent of any bond analysis depends on the circumstances of the particular case. *Id.* At 762-763. However under 23 Pa. C. S. A. §2511(b), the rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical, if found to be beyond the control of the parent.

Mother's visits with the Children were inconsistent. Mother never progressed to unsupervised visits. When Mother did attend her weekly supervised visits with the Children, visits went well. Between June 2016 and February 2017, Mother only attended eleven of her twenty-six visits, less than fifty percent. Mother admitted that she did not see the Children for a significant period of time. During that time, Mother testified that she called the Children every couple of weeks. Mother claimed that frequent visits and phone calls were too hard for her to deal with given the limited amount of time she was allowed with the Children. The Children usually looked forward to visits with Mother, and became very upset when she did not show. The Children know their Mother. Mother does not ask about the Children or for their medical appointments' schedule. (N.T. 2/21/17, pgs. 23-25, 36, 45-49). The Children have a strong bond with PGM and they look to her for all of their needs to be met. Child 1 receives speech therapy, for which PGM ensures her attendance, and special education services at her daycare. The Children rarely see their Mother and spend most of their time with PGM. Mother's bond with the Children is attenuated. Mother has not developed a real parental bond with the Children. CUA testified that adoption is in the best interests of the Children and neither would suffer irreparable harm if Mother's parental rights were terminated. The Children are in a safe, permanent, and pre-adoptive home. (N.T. 2/21/17, pgs. 12, 25-29). The DHS witness was credible. Consequently, the trial court did not abuse its discretion when it found, by clear and convincing evidence, that there was no parental bond and that termination of Mother's parental rights would not destroy an existing beneficial relationship.

**Conclusion:**

For the aforementioned reasons, the court properly found that DHS met its statutory burden by clear and convincing evidence regarding termination of Mother's parental rights pursuant

to 23 Pa. C. S. A. §2511 (a)(1), (2), (5), (8) and (b) since it would best serve the Children's emotional needs and welfare. The court also properly found that changing the Children's permanency goal from reunification to adoption was in Children's best interest. The trial court's termination of Mother's parental rights and change of goal to adoption were proper and should be affirmed.

By the court,

Joseph Fernandes, J.

## IN THE COURT OF COMMON PLEAS
## FOR THE COUNTY OF PHILADELPHIA
## FAMILY COURT DIVISION

| | | |
|---|---|---|
| In the Interest of A. S., a minor | : | CP-51-DP-0000527-2015 |
| | : | CP-51-AP-0000849-2016 |
| | : | |
| In the Interest of A. T., a minor | : | CP-51-DP-0000528-2015 |
| | : | CP-51-AP-0000848-2016 |
| | : | |
| | : | 51-FN-000448-2015 |
| | : | |
| APPEAL of: A.T., Mother | : | 993/1029 EDA 2017 |

## Proof of Service

I hereby certify that this court is serving today, May 10, 2017, the enclosed Opinion upon the following persons:

Kathleen Kim, Esq.
City of Philadelphia Law Department
1515 Arch Street, 16th Floor
Philadelphia, PA 19102
Attorney for DHS

Lisa Barrimond, Esq.
1441 Sansom Street
Philadelphia, PA 19102
Attorney for Appellee/Children, A.S. and A.T.

Gary Server, Esq.
52103 Delaire Landing
Philadelphia, PA 19114
Attorney for Appellant/Mother, A.T.

By: _Vijaya Singh_
Vijaya P. Singh
Law Clerk to the Hon. Joseph Fernandes
Philadelphia Family Court
1501 Arch Street, Suite 1431
Philadelphia, PA 19102
Telephone: (215) 686-2660